MICHELE BECKWITH
Acting United States Attorney
ROBERT ABENDROTH
Assistant United States Attorney

    United States Attorney's Office
    501 I Street, Suite 10-100
    Sacramento, CA. 95814
    Telephone: (916) 554-2700

HARMEET K. DHILLON
Assistant Attorney General, Civil Rights Division
CHRISTOPHER J. PERRAS
Special Litigation Counsel
SAMUEL A. KUHN
Trial Attorney

    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530
    Telephone: (202) 514-3847

JOHN A. EISENBERG
Assistant Attorney General, National Security Division
PATRICK CASHMAN
Trial Attorney

    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530
    Telephone: (202) 514-2007

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>NOAH JACOB LAMB,<br><br>    Defendant. | CASE NO. 2:25-CR-0152-TLN<br><br>GOVERNMENT'S MOTION FOR DETENTION |

1

I.  **INTRODUCTION**

Defendant Noah Lamb is a member of the Terrorgram Collective, a transnational terrorist group[1] that promotes white supremacist accelerationism: an ideology centered on the belief that the white race is superior; that society is irreparably corrupt and cannot be saved by political action; and that violence and terrorism is necessary to ignite a race war and "accelerate" the collapse of the government and the rise of a white ethnostate.  To achieve that end, the Terrorgram Collective solicits individuals to commit hate crimes, terrorist attacks on critical infrastructure, and assassinations; and provides technical, inspirational, and operational guidance to equip those individuals to plan, prepare for, and successfully carry out those attacks.  In this case, Defendant Lamb is charged with crimes arising out of his work on the Terrorgram publication titled, The List, which is a hit list of "high-value targets" for assassination.

The United States of America, by and through the undersigned attorneys, hereby moves to detain Defendant Lamb on the following grounds: (1) he is charged with soliciting the murder of federal officials—including a U.S. Senator, a U.S. District Court Judge, and a former U.S. Attorney—serious crimes that warrant detention to protect public safety and national security; (2) he has a history of threatening violence against politicians and minority groups; (3) there is probable cause that he both solicited and committed federal terrorism offenses, which carries a presumption of detention under § 3142(e)(3)(C); (4) he is a significant flight risk: his sentencing exposure (85 years in prison) gives him a powerful incentive to flee, he has no roots tethering him to the community, and just last year he was detained in Canada after illegally crossing the border and providing fake an alias to Canadian authorities; and (5) no combination of conditions would mitigate the foregoing risks and dangers because all he needs is an internet connection to continue to commit crimes as a member of the Terrorgram Collective, thus creating "an unacceptably high risk that [he] would not comply in good faith with the proposed conditions, or any other combination of release conditions, imposed upon [him]." *United States v. Hir*, 517 F.3d 1081, 1093 (9th Cir. 2008).  For those reasons, further detailed in this brief, the United States respectfully submits that Defendant Lamb should be detained pending trial.

---

[1] The Terrorgram Collective has been formally designated as a terrorist group by the United States, the United Kingdom, and Australia.

## II. PROCEDURAL POSTURE

On June 26, 2025, a federal grand jury in the Eastern District of California returned an indictment charging the defendant with eight federal felony offenses:

- Soliciting the murder of a federal official, in violation of 18 U.S.C. § 373 and § 1114 (3 counts);
- Doxing a federal official, in violation of 18 U.S.C. § 373 and § 119 (3 counts);
- Interstate threatening communications, in violation of 18 U.S.C. § 875(c) (1 count); and
- Conspiring to commit the foregoing offenses, in violation of 18 U.S.C. § 371 (1 count).

ECF 1. Defendant Lamb's indictment followed the indictment of his co-conspirators, Matthew Allison and Dallas Humber, who were charged, on September 5, 2024, in the Eastern District of California, with the same offenses arising out of their work on The List with Defendant Lamb, plus four counts of soliciting hate crimes involving an attempt to kill, two counts of distributing bombmaking instructions, and one count of conspiring to provide material support to terrorists. *See United States v. Humber et al.*, Case No. 2:24-cr-00257-DC. Both Humber and Allison have been detained pending trial.

On July 1, 2025, Defendant Lamb was arrested. In Defendant's room, agents found white supremacist accelerationist literature and gun parts, along with evidence that he had been assisting others in 3D printing gun parts. Exhibit A. In Defendant's bags, agents found paperwork from his illegal Canadian border crossing and detention indicating that he gave a false Russian alias—Anya Vasily Petrova—to Canadian authorities. Exhibit B. Defendant's initial appearance is scheduled for July 2, 2025. For the reasons set forth in this motion, the government is seeking detention.

## III. LEGAL STANDARDS AND PROCEDURES

The Bail Reform Act (BRA), 18 U.S.C. § 3141 *et seq.*, sets forth the rules governing pretrial detention in federal court.

### A. Eligibility for Detention

Under the BRA, if the United States moves to detain a defendant, a detention hearing "shall" be held if the case involves a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B). The required detention

3

hearing "shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance." *Id.* § 3142(f)(2).

### B.  Rebuttable Presumption of Detention

For certain enumerated offenses, there is a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" one of the enumerated offenses. *Id.* § 3142(e)(3). The list of offenses that trigger the rebuttable presumption of detention includes "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." *Id.* § 3142(e)(3)(C). As relevant here, the enumerated offenses in § 2332b(g)(5)(B) include sections "1114 (relating to the murder of a federal official)" and "2339A (relating to providing material support to terrorists)" of Title 18.

The rebuttable presumption of detention for defendants charged with a federal crime of terrorism is predicated on the reality that "terror rips civilization's fabric." *See United States v. Sheikh*, 994 F.Supp.2d 736 (E.D.N.C. 2014) ("Congress itself recognized the serious nature of terrorism by specifically compelling courts to consider whether the alleged crime is a 'Federal crime of terrorism.' 18 U.S.C. § 3142(g)(1). The allegation of such a crime weighs heavily against the defendant. It is not a common violent crime, but rather terror that rips civilization's fabric." (citing *United States v. Al–Arian*, 280 F.Supp.2d 1345, 1351 (M.D. Fla. 2003)). Given the grave danger posed by terrorists and those who support them, courts almost always detain defendants charged with terrorism offenses, even where other factors militate against detention.[2]

The presumption of detention shifts the burden of production to the defendant; the burden of

---

[2] *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (affirming detention of § 2339A defendant notwithstanding strong community ties and no criminal record); *United States v. Kurashev*, No. 2:21-CR-00040-KJM-1, 2023 WL 8358108, at *4 (E.D. Cal. Dec. 1, 2023) (detaining § 2339B defendant notwithstanding that he had no criminal history, had a positive employment history, and was a father of four young children); *Stone*, 608 F.3d at 950 (finding that "[w]hile only [two of five defendants] have prior criminal histories, courts have never required a prior criminal record before ordering detention" and holding that all five defendants charged with a crime of terrorism should be detained); *United States v. Salkicevic*, No. 15-CR-0060, 2015 WL 525556, at *3-*4 (N.D. Ill. Feb. 10, 2015) (detaining § 2339A defendant who was employed with husband and four minor children); *Sheikh*, 994 F.Supp.2d at 741 (detaining § 2339B defendant with no criminal record); *United States v. Ferdaus*, No. 11-10331, 2011 WL 5909547, at *7–9 (D. Mass. Nov. 28, 2011) (detaining § 2339B defendant with no criminal convictions); *United States v. Hassan*, No. 18-CR-603, 2021 WL 826253, at *3 (E.D.N.Y. Mar. 4, 2021) ("Even if I found the weight of the evidence favored defendant, the seriousness of the

persuasion remains with the United States. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). "Although most rebuttable presumptions found in the law disappear when any evidence is presented by the opponent of the presumption, the rebuttable presumption of § 3142(e) is not such a 'bursting bubble.'" *United States v. Garcia*, 801 F. Supp. 258, 261 (S.D. Iowa 1992) (citing *United States v. Jessup*, 757 F.2d 378, 383 (1st Cir. 1985)). To rebut the presumption of detention set forth in § 3142(e)(3), the defendant must come forward with evidence that he or she does not pose a danger to the community or a risk of flight. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.* The presumption remains as a factor to be weighed in recognition "that Congress has found that certain [offenders], as a general rule, pose special risks of flight [and danger]." *Garcia*, 801 F. Supp. at 261.

**C.     Section 3142(g) Factors**

The BRA provides four factors to guide a court's determination as to whether a defendant is a flight risk or a danger to the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to the community posed by the defendant's release. 18 U.S.C. § 3142(g). In cases with a rebuttable presumption of detention, the court considers the four factors "[t]o determine whether the presumptions of dangerousness and flight are rebutted." *Mercedes*, 254 F.3d at 436.

A judge "shall order" the "detention of the [defendant] before trial," if, after a detention hearing held under 18 U.S.C. § 3142(f), and upon consideration of "the available information concerning" the four enumerated factors, *id.* § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *id.* § 3142(e)(1). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). "[T]he government bears the burden of showing by a preponderance of the

---

charged offenses and the nature of his foreign ties would outweigh that factor."); *United States v. Mehanna*, 669 F. Supp. 2d 160, 165-66 (D. Mass. 2009) (detaining § 2339A defendant despite record of compliance with court-imposed release conditions).

5

evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

### D. Evidentiary Considerations

During a detention hearing, both the defendant and the government may offer evidence or proceed by proffer. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); § 3142(f)(2) ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."). The defendant "shall be afforded an opportunity to testify, to present witnesses on his own behalf, [and] to cross-examine witnesses who appear at the hearing." *Winsor*, 785 F.2d at 756. However, detention hearings "are not to be transformed into a full-fledged trial or a defendant's discovery expedition." *United States v. Terrones*, 712 F. Supp. 786, 791 (S.D. Cal. 1989).

## IV. ANALYSIS

### A. A Detention Hearing is Mandatory Under § 3142(f)

A detention hearing is mandatory under the BRA for two reasons. First, a detention hearing is mandatory under § 3142(f)(1)(A) because Defendant is charged with committing one crime of violence —namely, transmitting threatening communications, in violation of 18 U.S.C. § 875(c) (Count 8). *See United States v. Petersen*, 557 F.Supp.2d 1124, 1126 n.1 (E.D. Cal. 2008) ("A section 875 violation (transmitting threatening communications) constitutes 'a crime of violence' under the Bail Reform Act to which a statutory rebuttable presumption of flight and danger arises."). Additionally, Defendant is charged with three counts of *soliciting* a crime of violence—namely, the murder of a federal official, in violation of 18 U.S.C. § 1114 (Counts 2, 3, and 4); and three counts of doxing a federal official with the intent to *incite* a crime of violence (Counts 5, 6, and 7). *See United States v. Begay*, 33 F.4th 1081, 1093 (9th Cir. 2022) (holding that the federal murder statute is categorically a crime of violence). Second, a detention hearing is mandatory under § 3142(f)(2)(A) because there is a "serious risk" that the Defendant "will flee," for the reasons set forth in Section IV.C.4, *infra*, of this motion. For each of those reasons, the United States respectfully submits that a detention hearing is mandatory in this case.

### B. There is a Rebuttable Presumption of Detention in this Case

Because the Defendant is charged with three counts of *soliciting* an enumerated federal crime of terrorism—murder of a federal official, in violation of 18 U.S.C. § 1114 (Counts 2, 3, and 4)—and

because "there is probable cause" that the Defendant *committed* an additional enumerated federal crime of terrorism—conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A—there is a rebuttable presumption of detention under § 3142(e)(3)(C). *See Hir*, 517 F.3d at 1086 (noting the existence of "probable cause to believe that the defendant has committed an offense identified as a '[f]ederal crime of terrorism'" where grand jury returned an indictment charging the defendant with such an offense); *United States v. Marino*, 731 F.Supp.2d 323, 326 (S.D.N.Y.), *aff'd* 396 F. App'x 728 (2d Cir. 2010) (applying presumption of detention to defendant who had not been charged with an offense listed under § 3142(e)(3) but whose co-conspirators had been, reasoning that, under the plain language of the BRA, the key question is not whether the defendant has been charged with an offense to which the rebuttable presumption applies, but whether "there is probable cause to believe" that he has committed one).[3]  For those reasons, the rebuttable presumption of detention applies to Defendant Lamb and, considering the factors set forth in § 3142(g), addressed in the following Section of this brief, there are no conditions of release that will reasonably assure his appearance in court and the safety of the community.

    **C.**    **18 U.S.C. § 3142(g) Analysis**

Each of the four factors outlined in § 3142(g)—(1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the Defendant's history and characteristics; and (4) the nature and seriousness of the danger to the community posed by the Defendant's release—militates in favor of detention in this case.

    *1.*  *Nature and Circumstances of the Offenses*

Section 3142(g) instructs this Court to consider "the nature and circumstances of the offense charged, including whether the offense" falls within one of the enumerated categories of offenses that Congress designated as especially serious: "a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." § 3142(g).  The above categories, in Congress's judgment, capture "the most serious

---

[3] Defendant Lamb's co-conspirators have been charged with conspiring to provide material support to terrorists, 18 U.S.C. § 2339A, *see United States v. Humber et al.*, Case No. 2:24-cr-00257-DC, and that charge is predicated in part on their conspiracy with Defendant Lamb to solicit the murder of federal officials through their creation and dissemination of The List.

of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987).

The nature of the charged offenses weighs heavily in favor of detention. The Defendant is charged with eight felony offenses, seven of which involve crimes of violence (Counts 2-8), which the Ninth Circuit has deemed "the most serious of crimes," *Salerno*, 481 U.S. at 747. And while some federal offenses technically qualify as categorical crimes of violence even if they involve minimal force, the crimes charged against the Defendant are among the most serious and violent that one can imagine: soliciting the assassination of government officials.

The context of the charged offenses also militates in favor of detention. As set forth in the Indictments against Lamb, Humber, and Allison, the Defendant was a member of a transnational terrorist group that solicited others to commit bias-motivated mass-shootings, terrorist attacks on critical infrastructure, and assassinations for the purpose of accelerating the collapse of the government and inciting a race war. ECF 1. The Terrorgram Collective recruited impressionable teenagers to do their dirty work, promising them eternal glory—"Sainthood"—in return for committing an act of mass violence. Inspired and guided by the Terrorgram Collective, several teenagers—labeled in Humber and Allison's Indictment as "Attacker 1", "Attacker 2", and "Attacker 3"—carried out attacks (a bias-motivated mass-shooting in Slovakia, a bias-motivated mass-stabbing in Turkey) or were planning on carrying out an attack (an attack on energy facilities in the United States) when they were arrested by law enforcement. *See United States v. Humber et al.*, Case No. 2:24-cr-00257-DC. Since the indictment of Humber and Allison, more attacks have been traced back to the Terrorgram Collective, including a mass-shooting in Brazil, a plot to bomb an energy substation in Tennessee, a plot to assassinate an Australian politician, and the murder of two people in Wisconsin in furtherance of a plot to assassinate a U.S. official.

Finally, the circumstances of the charged crimes—specifically, the central role the Defendant played on The List project—further weigh in favor of detention. For years, the Defendant ran a Telegram channel devoted to doxing government officials and public figures and calling for their assassination. In 2021, the Defendant shared his doxes in Terrorgram group chats and campaigned for the creation of a kill list. Terrorgram leaders noticed his work, disseminated it broadly on other channels and group chats, and selected the Defendant to work on The List project, on which the Defendant played a central role. The Defendant nominated and doxed dozens of List targets—including the U.S. Senator referenced in the

indictment. The Defendant tracked down the addresses, phone numbers, photographs, and other personally identifiable information ("PII") of List targets and passed it along to Terrorgram leadership. ECF 1 at ¶10. Many of The List entries were taken verbatim from the Defendant's doxes. The Defendant and his co-conspirators made clear through messages they exchanged in a private group chat—messages the government extracted from Defendant Humber's cellphone—that their goal was not simply to harass List targets, but to solicit their assassination. As the Defendant reflected in a group chat, "Imagine if all these shooters actually choose their targets well instead of killing random people." Exhibit C. During an initial brainstorming session, the Defendant and his co-conspirators described their idea for The List as a "kill list in book form", "a kill book complete with full doxes and images", and "a phone book for kill list doxes". ECF 1 at ¶6. To ensure their purpose and intent was not lost upon the reader, the Defendant recommended that they begin The List with a quote from The Turner Diaries—a foundational text of accelerationism that popularized the concept of "the Day of the Rope"[4]—the mass execution, primarily by hanging, of "race traitors" and other enemies. ECF 1 at ¶11. The quote the Defendant recommended imagines the beginning of a coordinated massacre by death squads: "Squads of our troops with synchronized watches suddenly appeared in a thousand blocks at once, in fifty different residential neighborhoods, and every squad leader had a long list of names and addresses." *Id.* The group chat messages make clear that the Defendant and his co-conspirators envisioned The List to serve as that "long list of names and addresses" for the "day of the rope lynch mob" to murder. Exhibit D.

In sum, the nature, context, and circumstances of the charged crimes weigh in favor of detention. *See Mehanna*, 669 F. Supp. 2d at 165-66 (detaining defendant charged with violating § 2339A, finding that the defendant "promoted terrorist activities, encouraged others to engage in terrorism, recruited others to participate in terrorism, and protected, or attempted to protect, a terrorist from law enforcement scrutiny."); *United States v. Cole*, 465 F. Supp. 3d 1175, 1178 (W.D. Wash. 2020) (detaining defendant who "targeted victims because of their religion and ethnicity" and finding that, even though defendant had no criminal history or history of violent acts, "[t]he defendant is viewed as a risk of danger based on the nature of the instant offense, history of alleged weapon possession, and ties to an extremist

---

[4] Defendant brought up the Day of the Rope dozens of times in Terrorgram group chats.

organization."); *United States v. Dai*, No. 323CR478BKSTWD, 2023 WL 11016392, at *6 (N.D.N.Y. Dec. 19, 2023), *aff'd*, 99 F.4th 136 (2d Cir. 2024) (finding, in prosecution under § 875(c), that the nature of the offense supported detention when the defendant was alleged to have "posted online multiple threatening messages directed at the Jewish community at Cornell University including violent threats to kill Jewish students, rape Jewish women, and behead Jewish children").

### 2. Weight of the Evidence

"The weight of the evidence has the least force in the court's analysis, in recognition of the presumption of innocence that attaches to [a] defendant at the pretrial stage of a criminal proceeding." *United States v. Keeton*, 457 F. Supp. 3d 855, 859 (E.D. Cal. 2020), *aff'd*, No. 20-10162, 2020 WL 4805479 (9th Cir. June 17, 2020). This consideration factors into a court's analysis most heavily where charges are supported by scant or unreliable evidence, at one end of the spectrum—militating against detention—or by overwhelming and reliable evidence, at the other end—militating in favor of detention.

The weight of the evidence against the Defendant militates in favor of detention. The conspiracy itself is documented in group chats, spanning several years, that federal agents extracted from Defendant Humber's cellphone. The criminal nature and purpose of the conspiracy, and the Defendant's role in that conspiracy, is evident from the messages themselves. Defendant Lamb supplied raw data (names, addresses, phone numbers, photographs, etc.) to Defendant Allison, the project manager of The List. A search of a hard drive seized from Defendant Allison's storage unit revealed that when Defendant Allison received the raw data from Defendant Lamb, Defendant Allison converted that raw data into stylized List cards. From there, co-defendants Allison and Humber disseminated The List, individual List cards, and links to The List archive broadly to like-minded accelerationists on Terrorgram, along with comments encouraging them to take action. The evidence supporting the conspiracy, the Defendant's role in that conspiracy, and the substantive offenses committed in furtherance of that conspiracy, is strong.

Not only is the evidence against the Defendant *strong*; it is also *reliable* because it consists of statements of the Defendant and his co-conspirators and digital evidence extracted from their devices. Thus, the charges against the Defendant do not depend on a witness with a motive to lie, or physical evidence capable of being contaminated; the charges are based on his own statements, corroborated by

devices seized from other members of the Terrorgram Collective, and repeated over the course of several years. *See United States v. Saab*, No. 19-CR-676, 2021 WL 5868157 at *19 (S.D.N.Y. Dec. 10, 2021) ("The weight of the evidence against Saab appears to be quite strong, given that it consists primarily of statements he provided to law enforcement officers over the span of several months, in a dozen interviews.").

In summary, the weight of the evidence against the defendant is both strong and reliable, and this factor supports his pre-trial detention. *See United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (finding that "evidence of [defendant's] guilt is both substantial and credible" because the prosecution "is based in large part on direct evidence, including tape recordings").

### 3. *History and Characteristics*

In evaluating the defendant's history and characteristics, the BRA instructs the Court to consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Several of the above factors weigh neither for nor against detention. At this juncture, the United States does not have sufficient information upon which to base an informed judgment about the Defendant's physical condition, mental condition, or history of drug or alcohol abuse.

Ordinarily, the absence of a criminal record weighs against detention, but the fact that the Defendant and his co-conspirators have recruited and enlisted impressionable teenagers to commit attacks on their behalf, and have thereby avoided prior convictions, weighs in favor of detention, not against it. *See United States v. Patriarca*, 948 F.2d 789, 792 (1st Cir. 1991) (concurring with district court's conclusion "that the absence of a record was at least in part because [defendant's] position as Boss allowed him to rely on others to commit substantive crimes" such that he "did not have a clean slate despite his lack of a criminal record").

The most pertinent factor, in the government's view, and the one that weighs most heavily in favor of detention, is the Defendant's character. The Defendant is a terrorist who committed the charged offenses, in his words, to "make everything everywhere in a state of perpetual fear under the rule of extreme ultraviolence," Exhibit E, with List targets "terrorized 24/7," waking up every day "thinking 'is

11

today the day?'" Exhibit F.  The Defendant has devoted several years of his life to doxing government officials and other "high value targets" and calling upon others to assassinate them.  Not only has the Defendant solicited others to commit murder, evidence indicates that he personally desires to commit murders himself.  The Defendant posted on social media, "I think about murder quite a lot," elaborating that he fanaticized about "kill[ing] untold numbers of people" in "the most brutal and evil ways imaginable," including "bash[ing] tranny heads in," "curb stomp[ing] a tranny head," "shoot[ing] a mexican in the head," and "saw[ing] off" a person's head. Exhibit G.

The Defendant's history and characteristics—and his character in particular—weighs in favor of detention.

### 4. Risk of Flight

The Defendant poses a serious flight risk based on his sentencing exposure, his minimal ties to any community, his use of aliases, and his expressed intent (and previous attempt) to leave the country. The Defendant is charged with eight felony offenses that carry a cumulative statutory maximum sentence of 85 years in prison, and a Guideline range of life in prison—a sentencing exposure that gives him a powerful incentive to flee and, accordingly, militates strongly in favor of detention. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (noting that defendants who face "graver penalties . . . have an even greater incentive to consider flight"); *United States v. Figueroa-Alvarez*, 681 F.Supp.3d 1131, 1141 (D. Idaho 2023) (noting that the Ninth Circuit permits the district court to consider possible punishment as an incentive for a defendant to flee) (citing *United States v. Santos-Flores*, 794 F.3d 1088, 1092 (9th Cir. 2015)).  The Defendant demonstrated his risk of flight by illegally crossing the U.S.-Canada border less than a year ago.  In July 2024, the Defendant and his travel companion were detained by agents with the Canada Border Security Agency.  The Defendant and his travel companion gave false aliases to Canadian authorities and were detained for two weeks before they were released back into the United States. The Defendant's risk of flight is compounded by the minimal connection he has to any community.  He has no stable job, spouse, or children.  He does not own a home.  He spent the past several years, as he put it, "nomading the country . . . before I leave north America." Exhibit H.  After his arrest, the Defendant asked to place an international call to his "adoptive father" in Norway.  The

foregoing evidence establishes that there are no forces tethering him to any community strong enough to countervail his incentive to flee the jurisdiction to avoid life in prison.

### 5. *Danger Posed by Release*

If the Defendant is released, he would pose a danger to communities all over the world by continuing to solicit assassinations in furtherance of his terrorist ideology.

The "danger to the community" factor, courts have explained, captures not only the risk that the Defendant will engage in physical violence; it also reflects the danger that he will continue to engage in criminal activities to the detriment of the community. *See Tortora*, 922 F.2d at 884 ("It is important to note that danger to the community was not meant to refer only to the risk of physical violence."); *United States v. Boy*, 322 F. App'x 598, 600 (10th Cir. 2009) (quoting *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989)) ("The concept of safety of the community under § 3142(e) is not limited to the danger of physical violence, but rather 'refers to the danger that the defendant might engage in criminal activity to the detriment of the community.'").

The relevant community, for purposes of the Bail Reform Act, stretches beyond the community where a Defendant resides or engages in criminal activity; it includes any place, domestically or abroad, that faces a risk of danger posed by the Defendant's release. *See Hir*, 517 F.3d at 1088 ("Where, as here, a defendant is charged with an offense that had a significant adverse effect on a community abroad, we see no justification for preventing a court, for bail purposes, from considering the continuing risk to that community that might be posed by the defendant's pre-trial release."); *United States v. Petersen*, 557 F. Supp. 2d 1124, 1130 (E.D. Cal. 2008), *as amended* (May 23, 2008) (noting that "community" "extends beyond the district in which the crimes have occurred" and that "[t]he district judge may determine the threat a defendant poses to any community, whether in the United States or abroad").

Releasing the Defendant would pose a risk of danger to the worldwide community. As stated in Paragraph 2 of the General Allegations in the Indictment, the ultimate goal of the Terrorgram Collective is to "ignite a race war and 'accelerate' the collapse of the government and the rise of a white ethnostate." In furtherance of that goal, the Terrorgram Collective has already successfully induced terrorist attacks all over the world: the United States, Brazil, Slovakia, Turkey, and Australia. If the Defendant is released, there's no telling which community, in which country, would be victimized next. The danger to the

worldwide community posed by the Defendant's release is grave, and weighs strongly in favor of detention. *See United States v. Musse*, 107 F. Supp. 3d 1012, 1015 (D. Minn. 2015) (detaining defendant in prosecution for terrorism charges, finding that "the Defendant poses a risk of harm to the community" because he attempted to join a violent terrorist organization and, had he succeeded, he likely would have "reach[ed] back to Minnesota through social media to recruit other young men").

Placing strict restrictions on the Defendant's conditions of release would not mitigate that danger. Unlike traditional criminals, whose danger to the community can be reduced by confining them in their homes or a halfway house, all the Defendant needs is an internet connection to continue his criminal activity. *See United States v. Haider*, No. 23-CR-00299, 2023 WL 8544277, at *3 (E.D. Cal. Dec. 11, 2023) ("If released, the Court is concerned about Defendant's ability to access the internet either on one of his family member's devices, or some other device, to . . . cause further harm."); *United States v. Baker*, No. 23-CR-00261, 2023 WL 8254717, at *2 (D. Idaho, Nov. 29, 2023) (affirming magistrate judge's detention decision that "underscored the instrumentality of the internet to [defendant's] alleged crimes and that there was no practicable method of barring his internet access if he were to be released"); *United States v. Marigny*, No. 20-MJ-70755, 2020 WL 4260622, at *3 (N.D. Cal. July 24, 2020) (detaining defendant because "[w]hile phones and computers may be placed out of reach to limit Defendant's Internet access, they are overwhelmingly available in the community such that Defendant could gain access to the internet with virtually no supervision").

Ordering the Defendant not to use the internet would not solve the problem either because he has demonstrated the intent and ability to circumvent rules designed to restrict his wrongdoing. Telegram banned the Defendant's Telegram accounts, channels, and chats for posting extremist conduct. Rather than cease the offending conduct, the Defendant responded by creating new Telegram accounts, channels, and chats; by re-uploading their banned content; and by devising schemes designed to circumvent future Telegram bans. His course of conduct demonstrates his contempt for restrictions on his behavior and his willingness and technical ability to flout them.

Given this history, the Court can have no confidence that the Defendant would comply in good faith with a prohibition on internet use. *Hir*, 517 F.3d at 1092 (rejecting proposed release conditions on the basis that they "contain one critical flaw. In order to be effective, they depend on [the defendant's]

14

good faith compliance"); *Kurashev*, 2023 WL 8358108, at *5 ("[D]efendant's use of private networks and encrypted messaging applications, and his successful deletion of specific communications, are not consistent with someone acting only in good faith.").

Furthermore, because the Defendant committed the bulk of his criminal activity over the internet, the Court would have no reasonable means of monitoring his compliance with conditions of release. *See Hir*, 517 F.3d at 1092 (rejecting release conditions in part because the charged crimes "involve communications [over the internet] and that are therefore not readily susceptible to effective monitoring"); *United States v. Eccleston*, 140 F. Supp. 3d 102, 107 (D.D.C. 2015) ("According to the government, Eccleston committed the charged offenses . . . using a computer and a variety of non-attributable e-mail accounts. … [this] is a case in which supervision can do little to alleviate the risk that the defendant might access a computer or other electronic device and continue to engage in the alleged criminal behavior.").

In short, there are no conditions of release this Court could impose that would substantially mitigate the risk that the Defendant would find untraceable ways to access the internet and coordinate with other members of the Terrorgram Collective.

## CONCLUSION

For the reasons set forth above, and for the additional reasons that may be offered by the United States at a detention hearing in this matter, Defendant Lamb, if released, would pose an unacceptably high risk of flight and a danger to the community—risks that no condition or combination of conditions can reasonably mitigate. Accordingly, the United States respectfully submits that the Bail Reform Act compels his detention pending trial.

| MICHELE BECKWITH | HARMEET K. DHILLON | JOHN A. EISENBERG |
|---|---|---|
| Acting United States Attorney | Assistant Attorney General | Assistant Attorney General |
| Eastern District of California | Civil Rights Division | National Security Division |

| /s/ Robert Abendroth | /s/ Christopher J. Perras | /s/ Patrick Cashman |
|---|---|---|
| ROBERT ABENDROTH | CHRISTOPHER J. PERRAS | PATRICK CASHMAN |
| Assistant U.S. Attorney | Special Litigation Counsel | Trial Attorney |
| | SAMUEL A. KUHN | |
| | Trial Attorney | |